**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Stephen William BISCHEL,**
**Defendant–Appellant.**

No. 94–50328.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 1995.

Decided Aug. 4, 1995.

Michael J. McCabe, San Diego, CA, for defendant-appellant.

Stephen W. Peterson, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: WALLACE, Chief Judge, KOZINSKI and RYMER, Circuit Judges.

RYMER, Circuit Judge:

This appeal requires us to decide when there has been "final action" on an official request for evidence in a foreign country, where the court has suspended the running of the statute of limitations pursuant to 18 U.S.C. § 3292.[1]

Stephen Bischel was convicted of numerous offenses arising out of "broker's crosses" on investments sold by La Jolla Trading Group, which he owned. Because these transactions involved British commodity brokers, the government requested assistance of United Kingdom authorities through letters rogatory and obtained a court order under § 3292(a)(1) to suspend the running of the statute of limitations pending "final action" on the request.

Records were received pursuant to the official request at a time when the statute of limitations would normally have run on many of the offenses charged in the indictment; a Certificate of Authenticity that was also requested had not yet been received when the indictment was returned. We hold that "final action on the request" for purposes of § 3292 includes all of the items requested in the letters rogatory. Since the certification had been requested but had not yet been received, the district court did not clearly err in finding that "final action" had not been taken. The statute of limitations, therefore, continued to be suspended so that none of the counts now at issue was time barred. We also conclude that a § 3292 order sus-

1. 18 U.S.C. § 3292 provides:

(a)(1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

. . . . .

(b) Except as provided in subsection (c) of this section, a period of suspension under this sec-

tion shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

(c) The total of all periods of suspension under this section with respect to an offense—

(1) shall not exceed three years; and

(2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.

pending the running of the statute of limitations speaks as of the date the official request is made, not when the order suspending the statute is entered, and that to begin the period of suspension when the letters rogatory are issued does not run afoul either of the Ex Post Facto Clause or of Bischel's rights to due process.

As none of the other issues Bischel raises requires reversal, we affirm.

## I

Bischel formed La Jolla Trading Group (LJTG) with codefendants Andrew Vento and Wayne Richdale in 1983. LJTG sold leveraged investments in precious metals by cold-calling prospective clients. Bischel caused most of the investors' funds to be transferred to Midelton James and C. Sturge, commodity brokers in the United Kingdom, where he also maintained secret accounts for his own benefit.

Bischel engaged in "broker's crosses" by instructing the brokers to make offsetting trades in a particular precious metal, then to unwind the trades when the market had moved a specified amount. Although the net profit or loss on the entire position was zero, the losing trade would be posted to LJTG's account at the brokerages (thus inuring to the detriment of the firm's clients), and the profitable trade would be posted to Bischel's secret accounts. Proceeds from Bischel's British accounts were funneled back to him in California in the form of cash. Bischel sold his interest in LJTG in July 1985.

After the IRS Civil Division referred tax fraud allegations to the Criminal Investigation Division in 1988, the government applied for an order issuing letters rogatory, which was granted on July 27, 1989. The request sought bank records, records of precious metals trading activity, and certification of the authenticity of the records by an English court. On motion by the government, the district court suspended the statute of limita-

tions on November 20, 1989, pursuant to 18 U.S.C. § 3292, effective as of the date the letters rogatory had been issued. The government received the requested records sometime in October, 1991, but no certification.

A 112-count indictment was returned on July 30, 1992.[2] Bischel moved to dismiss on the ground that any statutes of limitations could only be suspended prospectively from the date of the § 3292 order, and that in any event the limitations periods started to run again under § 3292(c)(2) six months after October of 1991 when "final action"—producing the records (without certification)—was taken. Bischel's motion was also based on prejudicial preindictment delay. The district court denied the motion. The jury returned a guilty verdict on nearly all counts.

Bischel then moved for a new trial in light of newly discovered evidence that the government had been unable to verify from bank records that Bischel's girlfriend had used safety deposit boxes as she testified, and suborned perjury by putting her on the stand. The motion was denied. Bischel was sentenced to 20 years in custody, and was fined $25,000 on each count of conviction for a total of $2,350,000.

He appeals both from conviction and sentence.

## II

### A

■ Bischel first argues that the period of suspension ended six months after the government received the bank and brokerage records in October, 1991, which he asserts was "final action" pursuant to § 3292(c)(2); and that the statute of limitations accordingly ran on 56 counts prior to his being indicted on July 30, 1992. Subsection (c)(2) limits the period of suspension to six months if final action is taken before the statute of limitations would otherwise expire. As Bischel

---

**2.** It charged Bischel with mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343 and 18 U.S.C. § 2, aiding and abetting; conspiring to transport and transporting money taken by fraud in violation of 18 U.S.C. §§ 371 and 2314; conspiring to defraud the government and income tax evasion in violation of 18 U.S.C. § 371 and 26 U.S.C. § 7201; and operating a racketeering enterprise in violation of 18 U.S.C. §§ 1962(c) & 1963. Counts 1–6, 12, 20–22, 45–48 and 60 were dismissed before trial.

sees it, the total period of suspension was at most thirty three months and three days (if counted from the date on which the letters rogatory were issued rather than the date the order suspending the statute was entered, as he prefers), thereby barring prosecution of any offense committed before October 27, 1984. The government contends that no "final action" had been taken, and the statute remained in suspense, because the certification had not been received.

■ Although Bischel's argument assumes that (c)(2) applies and that it has the effect of tacking six months onto the period of suspension that ends with "final action," we read the statute differently. It seems to us that by its plain language, (c)(2) applies only when "final action" is taken before the statute of limitations—untolled by a § 3292 suspension order—has run. Subsection (c)(2) thus limits the time of tolling to six months when both the official request and the "final action" occur within the normal period of limitations. Here, all of the disputed counts have a five year limitations period and none of the offenses was committed after 1985. The limitations period calculated "without regard to this section," as (c)(2) provides, thus expired no later than 1990. Therefore, even if "final action" occurred when records (without certification) were received in October 1991, it did not occur before the untolled statute of limitations had run. Subsection (c)(2) is not triggered, leaving only § 3292(b), which terminates a period of suspension when final action is taken, and (c)(1), which caps all periods of suspension at three years.

Bischel does not explicitly argue that the indictment fails under these provisions as well as (c)(2), but if he is correct that "final action" was taken in October 1991, the actual time of suspension would necessarily be even less than under his (c)(2) analysis, which adds six months to the § 3292(b) period of suspension and assumes that the suspension remained in effect through April 30, 1992. We therefore turn to the question on which the parties focus: Whether "final action" had been taken when the records were received without certification, in October 1991, or had not been taken at all because no certification had been received when the indictment was returned in July, 1992.

■ "Final action" is not defined in the text of the statute. However, construing the concept of "final action" to include a dispositive response to each item set out in the official request, including a request for certification, is consistent with the statutory structure and legislative history. It also makes practical sense.

Section 3292(b) hinges the end of the period of suspension on final action by foreign authorities on "the request." The "request" referred to is the official request for "evidence of an offense" that is in a foreign country. 18 U.S.C. § 3292(a)(1). "Evidence of an offense" is essentially worthless unless admissible. Admissibility turns in part on authenticity. Fed.R.Evid. 902(3).[3] Thus, certifying that primary evidence is what it purports to be is inevitably part of the "evidence of an offense" within the meaning of § 3292(a)(1). We also look at legislative history here because the statutory words "final action" do not unambiguously resolve the interpretational task we face. Our construction comports with the legislative history indicating that § 3292, which was passed as part of the Comprehensive Crime Control Act of 1984, P.L. 98–473, was prompted by concern both for the difficulty of obtaining records in other countries, and of admitting them into evidence.[4] *See* H.Rep. No. 98–907,

---

3. Rule 902(3) provides for self-authentication of foreign public documents that are accompanied by a "final certification as to the genuineness of the signature and official position" of certain officials executing or attesting with respect to the document. If a document is self-authenticating, then "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required. . . ." Fed.R.Evid. 902.

4. As the House Report explains

H.R. 5919 provides a simple, inexpensive substitute for the cumbersome and expensive procedures presently required for the admission of foreign business records. The bill permits the admission of foreign business records if the custodian provides a certification setting forth certain information about the records and their manner of being kept. The Committee believes, in view of the inherent trustworthiness of such records and the ability of the defendant to challenge their admission if the

98th Cong., 2d Sess. at pp. 3–4 (1984), *reprinted in* 1984 U.S.C.C.A.N. at pp. 3182, 3578, 3580. Finally, the interests of certainty counsel against the construction Bischel suggests. He would have us hold that "final action" takes place when the last of the records requested has been received. However, there is no ready way of knowing when the last of anything has happened. Instead, pegging "final action" to disposition, up or down, of each of the items in the official request provides a more certain benchmark by which to measure whether the action that has been taken is "final" or not.

■ We therefore conclude that "final action" for purposes of § 3292 means a dispositive response by the foreign sovereign to both the request for records and for a certificate of authenticity of those records, as both were identified in the "official request."

■ There was no "final action" in October, 1991 as the district court could reasonably have found that at that time British officials had not yet finally decided whether to comply with the United States's request for a certification of authenticity. There was uncontroverted testimony by IRS case Agent James T. Caffey that discussions between the United States and British authorities regarding certification of the records as requested in the letters rogatory continued after the records were received and through the time of the indictment on July 30, 1992. For this reason, the district court's determination that no final action took place prior to the indictment was not clearly erroneous.

## B

■ Bischel contends that the district court erred in holding that the statute of limitations was suspended as of July 27, 1989, when the letters rogatory were issued, instead of November 20, 1989, when the order suspending the statute was entered, on the

ground that a § 3292 order cannot revive or extend an expired period of limitations. We disagree.

Section 3292(b) itself states that the suspension period "shall begin on the date on which the official request is made." An "official request" includes a letter rogatory. 18 U.S.C. § 3292(d). In addition, § 3292(a)(1) requires the court to find that an official request "has been made" before entering an order suspending the statute of limitations. Thus, the statute plainly contemplates that the starting point for tolling the limitations period is the official request for evidence, not the date the § 3292 motion is made or granted. *See United States v. Miller,* 830 F.2d 1073, 1076 (9th Cir.1987), *cert. denied,* 485 U.S. 1033, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988) ("The statute itself specifies the only relevant time the application must be made: 'before return of an indictment.'").

■ The cases Bischel relies upon are inapposite, as they simply suggest that prosecution under a statute which purports to revive a limitations period after it has run would fall afoul of the Ex Post Facto Clause. *See, e.g., Clements v. United States,* 266 F.2d 397, 399 n. 4 (9th Cir.), *cert. denied,* 359 U.S. 985, 79 S.Ct. 943, 3 L.Ed.2d 934 (1959); *United States v. Knipp,* 963 F.2d 839, 844 (6th Cir.1992); *United States v. Madia,* 955 F.2d 538, 539–40 (8th Cir.1992). Here, however, it isn't a new statute that is the culprit, but its judicial application.[5] Therefore, the district court did not err in ordering the period of suspension to begin as of the date the letters rogatory were issued.

## C

■ Bischel maintains that § 3292 violates the Due Process Clause as applied to him because it takes away his right to a fixed statute of limitations and removes the predictability of a specific time limit beyond which he could not be prosecuted. Yet Bis-

source of information from which they were made or the method or circumstances of their preparation indicate lack of trustworthiness, that the legislation adequately protects against the admission of unreliable evidence while at the same time facilitating the admission of a type of evidence that is being required in an

ever increasing number of Federal prosecutions.
1984 U.S.C.C.A.N. at 3580.

**5.** We address Bischel's argument that application of § 3292 to offenses committed before it was enacted violates the Ex Post Facto Clause in Part III.D., *infra.*

chel fails to locate the source of any right to a fixed period of limitations. In any event, § 3292(c) sets a clear point beyond which the limitations period may not be extended: either three years if there is no "final action" at all, or no more than six months if there is "final action" within the period.

▇ Bischel also argues that § 3292 is constitutionally infirm because it lacks any requirement that the government diligently seek evidence located in a foreign country. For this he relies on the Second Circuit's opinion in *United States v. Watson*, 599 F.2d 1149, *modified*, 690 F.2d 15 (2d Cir.1979). *Watson* involved a sealed indictment that was filed within the limitations period but was not unsealed until the limitations period would have expired but for the indefinite tolling afforded by Fed.R.Crim.P. 6(e). The concern that animated the statement upon which Bischel relies in the court's original opinion, that the time a sealed indictment could toll the statute of limitations is constrained by the government's legitimate need for delay, 599 F.2d at 1154, is inapposite to § 3292, which has a built-in limit. Hence, we decline to read a diligence requirement into § 3292.

**D**

▇ Bischel submits that applying § 3292 to offenses alleged to have been committed prior to its enactment on November 12, 1984 violates the Ex Post Facto Clause by depriving him of the "defense" of the statute of limitations which was available at the time the offenses were committed. We agree with the district court that no ex post facto problem arises as Bischel's conduct was already criminal at the time § 3292 was enacted.

We considered a similar issue in *Clements*. There, Congress had amended a statute to increase the limitations period after the defendant's offense had been committed but before the original period had run. We rejected an Ex Post Facto Clause challenge because the amendment "did not render a previously innocent act criminal," "did not aggravate or increase the punishment for the crimes" involved, and did not deprive the accused "of some protection or defense previously available." *Clements*, 266 F.2d at 399. Here, as in *Clements*, an indictment brought

on the day of the official request would not have been untimely.

Nothing in *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), relied upon by Bischel, requires us to revisit *Clements*. Indeed, *Youngblood* reinforces the view that the Ex Post Facto Clause bars modification of only those defenses that constitute alterations in the legal definition of the offense. *Youngblood*, 497 U.S. at 50, 110 S.Ct. at 2723.

Other circuits considering the same issue in light of *Youngblood* have arrived at the same result. For example, in *Knipp*, the Sixth Circuit rejected the defendant's attempt to rely on *Youngblood* to argue that a statute, applied to extend the statute of limitations on crimes committed before it was enacted, was an ex post facto law because it deprived him of a defense that had previously existed. Pointing out that the Court in *Youngblood* distinguished between defenses that went to a nullification of an element of the crime and defenses that were matters "in bar of prosecution," *Knipp* concluded:

> The defensive use of a statute of limitations is a procedural defense in the nature of a plea in bar. Because it has nothing to do with the internal structure of the crime or its elements, it is not the kind of 'defense' that the Supreme Court was referring to in *Beazell* [*v. Ohio*, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925) ] [quoted in *Youngblood* ] when it stated that the Ex Post Facto Clause was violated if a defendant was later deprived of a defense that had been available to him at the time he committed the crime in question.

963 F.2d at 844. Likewise in *United States v. Brechtel*, 997 F.2d 1108 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 605, 126 L.Ed.2d 570 (1993), the Fifth Circuit explained that the Ex Post Facto Clause

> prohibits only enactment of statutes which: (1) punish as a crime an act previously committed which was innocent when done; (2) make more burdensome the punishment for a crime, after its commission; or (3) deprive one charged with a crime of any defense available according to law at the time when the act was committed.

Only statutes withdrawing defenses related to the definition of the crime, or to the matters which a defendant might plead as justification or excuse fall within the latter group. Plainly, extension of the limitations period neither criminalizes previously innocent conduct nor enhances the punishment for an existing crime. Further, while § 3293 deprives Brechtel of the five-year limitations period in effect when the questioned transactions occurred, it did not deprive him of a defense within the meaning of the ex post facto clause.

997 F.2d at 1113 (footnotes omitted).

We are persuaded by this reasoning as well, and reaffirm our previous view that extending the period of limitations pursuant to § 3292 does not deprive Bischel of a defense contrary to the Ex Post Facto Clause.

### III

■ Bischel asserts that the indictment should have been dismissed due to presumptively prejudicial pretrial delay. We disagree, as a defendant's Fifth Amendment right to due process is not infringed in the absence of a showing of actual, definite and non-speculative prejudice arising from the delay. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) and *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), make it clear that actual prejudice is a necessary part of the showing required, *Lovasco,* 431 U.S. at 789–90, 97 S.Ct. at 2048–49, and we have emphasized that showing actual prejudice entails proof by "definite and non-speculative evidence" that loss of testimony has meaningfully impaired the defendant's ability to defend himself. *United States v. Huntley,* 976 F.2d 1287, 1290 (9th Cir.1992) (commenting that the showing is " 'so heavy' that we have found only two cases since 1975 in which any circuit has upheld a due process claim.").

Bischel's reliance on *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), is unavailing. Bischel complains of preindictment delay; *Doggett* was a case of postindictment delay. A Sixth Amendment case, *Doggett* by its own terms is inapplicable. 505 U.S. at 654, 112 S.Ct. at 2692 ("Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution").

Bischel makes no showing of actual prejudice. The district court therefore did not err in rejecting his claim that the duration of the government's investigation violated fundamental conceptions of justice or violated the community's sense of fair play and decency as *Lovasco* requires. *Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2048–49.

### IV

■ Bischel argues that he was entitled to a new trial because Karen Batza, his former girlfriend and a government witness, testified that she had seen Bischel receive cash payments of $100,000 on several occasions and that she had made 90 to 100 trips to place cash and precious metals in safety deposit boxes at local banks—but the government's attempts to have the banks verify that these safety deposit boxes existed had failed. Bischel's counsel found this out after trial but before sentencing. Bischel claims that the government failed to meet its *Brady*[6] obligations and, by putting Batza on the stand, knowingly suborned perjury.

■ We review a district court's denial of a new trial based on newly discovered evidence for abuse of discretion, *United States v. Endicott,* 869 F.2d 452, 454 (9th Cir.1989); we see none here. Its finding that Bischel had not carried his burden of showing that Batza committed perjury is not clearly erroneous. She may or may not have been wrong about which banks she visited, but there is no evidence that she was deliberately or knowingly so.[7] Agent Caffey's affidavit indicates that there are many reasons why records of visits to safety deposit boxes might not be available. In any event, Batza's testimony was corroborated in significant re-

---

**6.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**7.** We decline to grant the government's motion to augment the record on appeal because the proffer is not a "correction or modification" of the record within the meaning of F.R.A.P. 10(e) but a new, post-trial addition to it. As such, it is outside the scope of the record on appeal as defined by Circuit Rule 10–2.

spects: two brokers through whom Bischel worked confirmed her testimony about deliveries of cash in $100,000 parcels; one of the brokers testified to Batza's role in running banking errands for Bischel; and British brokerage employees confirmed her testimony regarding the nature of the trade crossing scheme. Further, the absence of verification was in fact used to impeach Batza. "[N]ewly discovered evidence to impeach a government witness does not warrant a new trial when the evidence would not have affected the jury's assessment of the witness' credibility and when the witness was subjected to vigorous cross-examination." *Endicott*, 869 F.2d at 456. Accordingly, we cannot say that there is a reasonable probability that the verdict would have been different. *Id.* at 455.

## V

 Bischel submits that his 20-year sentence was "impermissibly disparate" to those imposed on his codefendants, Vento and Richdale, who both pled guilty. Vento received probation only; Richdale, a sentence of two years. Bischel argues that their relatively lenient sentences required the district court to place on the record its reasons for reaching the result in his case, and that the court failed to do so.

Generally, the imposition of disparate sentences alone is not an abuse of discretion, and a judge isn't required to give reasons for a disparate sentence in the absence of any evidence that a defendant is being punished for exercising his right to stand trial. *United States v. Castro*, 887 F.2d 988, 1001 (9th Cir.1989). However, Bischel contends that *United States v. Capriola*, 537 F.2d 319 (9th Cir.1976), requires an explanation because the disparity here suggests that he received a more severe sentence on account of exercising his trial rights.

In *Capriola*, we held that an explanation, not a formal statement of reasons, is required when there is substantial disparity in sentences imposed upon different individuals for engaging in the same criminal conduct. *Id.* at 321. The colloquy during Bischel's sentencing hearings and during those of Richdale and Vento show that there were several reasons why Bischel's sentence was higher. The court carefully considered fac-

tors other than their guilty pleas in sentencing Richdale and Vento. Vento and Richdale withdrew from the criminal activity well before Bischel did. Bischel, with five prior felony convictions, had the most extensive criminal history of the three. Bischel ran La Jolla Trading Group; Vento and Richdale worked for him. Bischel's counsel agreed that Bischel was more culpable than either Vento or Richdale and that Bischel could be characterized as the organizer of the fraud, and the district court expressly found that Bischel was the "most culpable individual on this La Jolla Trading Group scheme." Absent a suggestion of an impermissible motive, this suffices to support the district court's sentencing decision. *United States v. Garrett*, 680 F.2d 650, 652 (9th Cir.1982). Our review of the record conveys no impression that the sentencing disparity was due to an impermissible motive to punish Bischel for exercising his trial rights. We therefore conclude that the district court's explanation adequately comported with the "preservation of the appearance of judicial integrity and impartiality" that *Capriola* seeks to assure. *Capriola*, 537 F.2d at 321.

AFFIRMED.