NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0324n.06
Filed: June 6, 2008

No. 07-5307

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | TENNESSEE, WESTERN DIVISION |
| ROBERT BOHN, | ) | |
| | ) | |
| Defendant-Appellant, | ) | |

BEFORE: SUHRHEINRICH and ROGERS, Circuit Judges; and BELL, Chief District Judge.[*]

PER CURIAM. Robert Bohn appeals his conviction and sentence following a bench trial on racketeering, mail fraud, money laundering, and criminal forfeiture charges. For the reasons that follow, we affirm Bohn's conviction, but we reverse the preliminary order of forfeiture and remand for further proceedings.

I.

In 1994 the United States government began its investigation into the activities of IDM Direct Marketing ("IDM"), a company located in Barbados, that was allegedly engaged

---

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

in the business of selling foreign and domestic lottery chances to customers in the United States. In July 1996 the FBI and the Barbados police executed search warrants at IDM's offices in Barbados and seized computers and business records. IDM representatives challenged the search and a Barbados court entered an order sealing the documents and preventing their removal from Barbados pending a judicial determination of the legality of the searches. On December 14, 1998, the United States government obtained an *ex parte* order suspending the statute of limitations pursuant to 18 U.S.C. § 3292 based on the difficulties it was encountering in obtaining the foreign evidence.

On May 8, 2002, a grand jury in the Western District of Tennessee returned an eighty-nine-count indictment charging seventeen individuals with racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); RICO conspiracy in violation of 18 U.S.C. § 1962(d); mail fraud in violation of 18 U.S.C. § 1341; money laundering in violation of 18 U.S.C. § 1956(a)(2); and criminal forfeiture allegations pursuant to 18 U.S.C. §§ 982, 1963(a)(2). The indictment alleged that between 1989 and 1996 the defendants were involved in IDM's sale of lottery tickets to customers in the United States through the use of fraudulent mail promotions or telemarketing tactics.

Defendant Bohn was arrested on December 4, 2002. He was released from custody on February 10, 2003, on a secured bond with conditions that precluded him from leaving the United States and from returning to Vanuatu, his country of residence.

On January 9, 2003, the district court entered an order designating the case as

complex pursuant to 18 U.S.C. § 3161(h)(8)(B)(ii). The effect of this ruling was to exempt

the case from the time limitations of the Speedy Trial Act, 18 U.S.C. § 1361.

On April 23, 2003, the district court dismissed the indictment on the grounds that the

prosecution was barred by the statute of limitations because facts supporting the suspension

of the statute of limitations had not been alleged in the indictment. The judgment dismissing

the indictment was reversed on appeal and the case was remanded for further proceedings.

*United States v. Titterington*, 374 F.3d 453, 460 (6th Cir. 2004).

Bohn's motions to dismiss the indictment based on violations of his Fifth Amendment

right to due process, 18 U.S.C. § 3292, and his Sixth Amendment right to a speedy trial were

denied. Of the seventeen named defendants, only Bohn went to trial.[1]

Bohn's bench trial commenced on September 12, 2005, and proofs were completed

on September 23, 2005. On October 26, 2005, the district court entered an oral ruling finding

Bohn guilty on all counts against him. Specifically, Bohn was convicted on one count of a

RICO violation (Count One); one count of a RICO conspiracy (Count Two); twenty-one

counts of mail fraud (Counts Four, Five, Seven, and Fifty-Five through Seventy-Two); and

sixteen counts of money laundering (Counts Seventy-Three through Eighty-Eight). After the

verdict the government moved for a preliminary order of forfeiture.

On February 28, 2007, Bohn was sentenced to incarceration for time served (ten

---

[1]As to Bohn's sixteen co-defendants, five entered pleas of guilty or *nolo contendere* pursuant to plea agreements, seven were dismissed, and four remained at large in foreign countries.

weeks) and supervised release for time served (forty months), a fine of $2,000, a special

assessment of $3,900, and criminal forfeiture as to Count 89.  On March 6, 2007, a

preliminary order of forfeiture was entered forfeiting Bohn's interest in $22,409,494.48, to

be satisfied from enumerated bank accounts.  Bohn timely filed this appeal.

**II.**

Bohn's first argument on appeal is that the district court erred in denying his motion

to dismiss the indictment as time-barred.  Bohn contends that the indictment should have

been dismissed on statute of limitations grounds because the tolling order was improperly

issued.

We review the district court's denial of the motion to dismiss on statute of limitations

grounds *de novo* and the underlying factual findings under either an abuse of discretion or

clear error standard.  *United States v. Grenier*, 513 F.3d 632, 635-36 (6th Cir. 2008); *United

States v. Grenoble*, 413 F.3d 569, 572 (6th Cir. 2005).

There is no question that absent an order suspending the statute of limitations, the

five-year statute of limitations would have run before the indictment was returned.[2]  Bohn

contends that although the government obtained an order suspending the statute of

limitations, the suspension order failed to comply with due process and the requirements of

---

[2]The RICO, mail fraud, and money laundering charges are governed by the five-year limitations period that applies to most non-capital offenses. *Titterington*,  374 F.3d at 455 (citing 18 U.S.C. § 3282(a)).  The acts charged in the indictment that relate to Bohn occurred in 1995 and 1996, and the indictment was not filed until May 8, 2002.

18 U.S.C. § 3292, because it was *ex parte*, it was not supported by evidentiary material, it

was based on a treaty that had not been ratified, and it failed to disclose material facts.

Section 3292 provides that if, before the return of an indictment, the government

makes an application indicating that evidence of an offense is in a foreign country, the

district court is required to suspend the statute of limitations if it finds by a preponderance

of the evidence that the government has made an "official request" for such evidence and that

it reasonably appears that such evidence is in such foreign country.  18 U.S.C. § 3292(a)(1).[3]

Bohn contends that the government's *ex parte* application was not permissible under

the statute and violated his due process rights.  The only circuits that have addressed the issue

have concluded that *ex parte* applications are permissible under § 3292.  *United States v.*

*Torres*, 318 F.3d 1058, 1061 (11th Cir. 2003) ("Under § 3292, the government may apply,

*ex parte*, for suspension of the statute of limitations when it seeks evidence located in a

---

[3]Section 3292 provides in pertinent part:

> Upon application of the United States, filed before return of an indictment,
> indicating that evidence of an offense is in a foreign country, the district court
> before which a grand jury is impaneled to investigate the offense shall suspend
> the running of the statute of limitations for the offense if the court finds by a
> preponderance of the evidence that an official request has been made for such
> evidence and that it reasonably appears, or reasonably appeared at the time the
> request was made, that such evidence is, or was, in such foreign country.

18 U.S.C. § 3292(a)(1).

foreign country."); *United States v. Wilson*, 249 F.3d 366, 371 (5th Cir. 2001) ("An

application to toll the statute of limitations under § 3292 is a preindictment, ex parte

proceeding."); *DeGeorge v. U.S. Dist. Court*, 219 F.3d 920, 937 (9th Cir. 2000) (finding no

basis in the statute for disallowing an *ex parte* application). We agree. There is nothing in

the statute to suggest that individuals who might be affected by the suspension of the statute

of limitations are entitled to notice or hearing on the government's application. *DeGeorge*,

219 F.3d at 937.

Neither does the *ex parte* nature of the application violate the Fifth Amendment's Due

Process Clause. We examine procedural due process claims under a two-part analysis: first,

we determine whether the interest at stake is a protected liberty or property right; second, we

determine what procedures are required to protect that interest. *Singfield v. Akron Metro.*

*Housing Auth.*, 389 F.3d 555, 565 (6th Cir. 2004) (construing the Fourteenth Amendment

Due Process Clause).[4] The suspension order in this case complied with the

Section 3292 requirement that the order be obtained prior to indictment. Bohn has not

identified any source of a right to a fixed period of limitations prior to indictment. In the

absence of an identified right, Bohn cannot state a procedural due process claim based upon

---

[4]Because the language and policies of the Due Process Clauses of the Fifth and
Fourteenth Amendments are essentially the same, due process cases decided under the
Fourteenth Amendment provide guidance in due process cases arising under the Fifth
Amendment. *Medical Mut. v. deSoto*, 245 F.3d 561, 575 (6th Cir. 2001); *Rep. of Pan. v.
BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 944 (11th Cir. 1997).

the lack of notice and a hearing before the limitations period was suspended. *See United States v. Bischel*, 61 F.3d 1429, 1434-35 (9th Cir. 1995) (rejecting a due process challenge to § 3292 where the defendant failed to locate the source of any right to a fixed period of limitations); *United States v. King*, No. 98-CR-91A, 2000 WL 362026, at 21 (W.D.N.Y. Mar. 24, 2000) ("As § 3292 is a legislative modification of all federal criminal statutes of limitations and itself subject to strict limitations, . . . there is no basis to find that a subject or target of a grand jury proceeding must be granted an opportunity to be heard on an application for suspension of the applicable statute."); *see also United States v. Haug*, 21 F.R.D. 22, 25 (N.D. Ohio 1957) (holding that an accused "may not complain if the statute of limitations is extended so long as the period of time originally provided therein had not run at the time of such extension" because an accused does not acquire any vested right in a statute of limitations until it has operated to bar the prosecution of the offense with which he has been charged).

Because § 3292 applications must be made before the return of an indictment, *ex parte* applications are consistent with the traditionally non-adversarial and secret nature of grand jury proceedings. *DeGeorge,* 219 F.3d at 937 (citing *United States v. Calandra*, 414 U.S. 338, 343-44 (1974)). *Ex parte* applications are also consistent with the possibility that at this pre-indictment investigative stage all of the individuals who might be affected by the suspension of the statute of limitations have not yet been identified. Finally, even when a suspension order is issued on an *ex parte* basis, a defendant has an opportunity to challenge

the suspension order after the indictment is returned, as Bohn did in this case. Accordingly, we find that the *ex parte* nature of the § 3292 suspension order did not violate Bohn's right to due process.

Bohn contends that the order suspending the statute of limitations also failed to comply with the statute because it was not supported by evidentiary material. The statute requires a finding by a preponderance of the evidence that an official request has been made and that it reasonably appears that evidence of an offense is in the foreign country. Before a court can make this finding "the government has some burden to establish, as opposed to being able merely to assert without support, that the foreign evidence it seeks meets the section's requirements." *DeGeorge*, 219 F.3d at 937. The Eleventh Circuit has held that the government's submission of its application and a copy of the Department of Justice Office of International Affairs ("OIA") request was not, standing alone, sufficient to satisfy the government's burden because these documents did not contain any indicia of reliability to support the government's contention that evidence of an offense was located in a foreign country. *United States v. Trainor*, 376 F.3d 1325, 1133 (11th Cir. 2004). Although an OIA request itself was sufficient to show that an official request for evidence had been made to a foreign country, the Eleventh Circuit held that it was not sufficient to show that it was reasonably likely that evidence was in fact located in that foreign country. *Id.* at 1333-34. Bohn contends that the evidence submitted in support of the application in this case was similarly inadequate to show that it was reasonably likely that evidence of an offense was in

Barbados.

Although the Eleventh Circuit required the government to provide something more

than an unsworn recitation of the evidence in its possession, it did not establish a high

standard of proof:

> Our reading of the § 3292 preponderance of the evidence requirement is quite
> broad and the Government may satisfy its burden by including a sworn or
> verified application containing the necessary factual information, testimony by
> Government officials, affidavits, declarations, exhibits, or other materials of
> evidentiary value. Indeed, as the district court noted, the Government's
> evidence could even include hearsay evidence.

*Id.* at 1332-33.

The evidence the government submitted in this case included not only the application

and the OIA request, but also a certified copy of an order from a Barbados court relating to

the issuance and execution of search warrants at the premises of IDM in Barbados. We agree

with the district court that the order of the Barbados Court referring to the issuance of a

search warrant provided sufficient indicia of reliability to enable the district court to find by

a preponderance of the evidence that evidence of an offense was located in Barbados at the

time the government filed its application. *See United States v. Titterington*, 354 F. Supp. 2d

778, 787 (W.D. Tenn. 2005).

Bohn's third contention with respect to the order of suspension is that the

government's application failed to satisfy the requirements of § 3292 because it was based

on a treaty that had not been ratified.

The government stated in its § 3292 application that the OIA sent a Letter of Request to the Attorney General of Barbados for the issuance and execution of search warrants on IDM.  A copy of the Letter of Request was attached to the § 3292 application.  The Letter of Request indicated that the government was making a request for assistance "pursuant to the Treaty Between the United States and Barbados on Mutual assistance in Criminal Matters, signed at Bridgetown on February 28, 1996."

Although the United States and Barbados entered into a Treaty regarding assistance in criminal investigations in February 1996, the record reflects that the Treaty did not enter into force until it was ratified by both countries in 2000 or 2001.  The record also reflects that the lack of ratification had been brought to the attention of the government in February 1997, before the government applied for tolling under § 3292 in December 1998.

The fact that the Treaty was not ratified does not defeat the § 3292 application because the statute only requires an "official request."  For purposes of § 3292 the term "official request" is defined as "a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country." 18 U.S.C. § 3292(d).  The district court correctly found that the OIA's Letter of Request was an official request that satisfied the requirements of § 3292(d).

Bohn contends that the § 3292 application nevertheless failed to satisfy the requirements of § 3292 because it contained material omissions and misrepresentations.

Specifically, Bohn highlights the government's failure to make the following disclosures: that the Treaty had not been ratified, that the Barbados prosecutor had previously rejected the government's production request based on the lack of legal authority, and that the government had already reviewed and copied the documents.

The district court held an evidentiary hearing on these allegations and found that the government had made a formal request for cooperation from the Barbados authorities, the Barbados authorities had in fact cooperated with the government in executing the search, and the Barbados court's order staying the proceedings was being challenged in the courts of Barbados. The district court also made a factual determination that the government had not had an opportunity to review all of the documents that were in Barbados. Although troubled by the government's failure to disclose information relating to the Treaty and the letter from the Barbados prosecutor, the district court determined, based upon her findings, that the government's omissions were not material to her issuance of the suspension order. Bohn has not shown that these factual findings were clearly erroneous or an abuse of discretion. Based upon these findings, we are satisfied that the district court properly concluded that the suspension order satisfied the requirements **III.** of due process and § 3292.

Bohn's second argument on appeal is that he was denied his constitutional right to a speedy trial.

The Sixth Amendment to the United States Constitution guarantees, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public

trial." U.S. Const. amend VI. We review the constitutional question of whether a defendant has been denied his constitutional right to a speedy trial *de novo*, but we review the district court's factual findings for clear error. *United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999). In determining whether a defendant has been deprived of his Sixth Amendment right to a speedy trial we balance: "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant." *Id.* at 348 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

Bohn was arrested in December 2002 and was not tried until September 2005. This delay of more than two-and-a-half years between accusation and trial is sufficient to trigger the *Barker* inquiry. *See Brown*, 169 F.3d at 348-49 (noting that delays over one-year are presumptively prejudicial). As to the remaining three *Barker* factors, the district court found that Bohn was diligent in asserting his right to a speedy trial, that the government was responsible for some of the delay, and that Bohn was prejudiced by the delays. Nevertheless, the district court determined that neither the delay nor the prejudice was so extreme as to amount to a denial of due process warranting dismissal of the indictment.

Bohn does not contend that the district court's factual findings were erroneous. Rather, he contends that the factual findings cannot be reconciled with the district court's conclusion that there was no constitutional speedy trial violation. Bohn contends that because the district court found in his favor on all four *Barker* factors, he was entitled to dismissal of the indictment.

Bohn misconstrues the purpose of the *Barker* factors. Contrary to Bohn's contention, a finding in the defendant's favor on each of the four *Barker* factors does not necessarily warrant dismissal of the indictment. A dismissal is required only when the court finds that a defendant's constitutional right to a speedy trial has been violated. *See Brown*, 169 F.3d at 348 ("When a defendant's constitutional right to a speedy trial has been violated, dismissal of the indictment is the only available option even when it allows a defendant who may be guilty of a serious crime to go free."). A violation of the right to speedy trial arises when "the circumstances of the case are such that further delay would endanger the values the right protects." *Barker*, 407 U.S. at 522. The *Barker* factors help focus this inquiry, but none of the four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id*. at 533. The *Barker* factors must be considered together with other relevant circumstances. *Id.* "In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.*

With respect to the first factor, delay, we ask whether the delay was "uncommonly long." *Doggett v. United States*, 505 U.S. 647, 651 (1992). Here, the delay attributable to the government does not include the fourteen months while the government's appeal was pending or the six months while defendant's motion to compel discovery was under advisement. Although the delay attributable to the government still exceeded a year, the delay was not uncommonly long given the complicated nature of the conspiracy. As noted in *Barker*, "the delay that can be tolerated for an ordinary street crime is considerably less

than for a serious, complex conspiracy charge." 407 U.S. at 531. Moreover, different weights are assigned to different reasons for delay. *Id.* The district court found that the government was responsible for some of the discovery delays caused by the government's "questionable tactics" of misleading the court as to the availability of the information on a computer hard drive. Nevertheless, the district court found no deliberate attempt to delay the trial in order to hamper the defense, so the delay is not weighted as heavily against the government. *See id.* at 531.

The fourth *Barker* factor requires the defendant to show that "the delay caused 'actual prejudice' to his defense." *Brown*, 169 F.3d at 350.[5] "Actual prejudice is determined by examining whether the defendant has suffered (1) oppressive pretrial incarceration; (2) anxiety and concern; and (3) impairment to his defense." *Id.* "Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532).

Bohn was confined in jail for ten weeks before he was released on bond. Although the conditions of his release restricted him from returning to his home country, Bohn had substantial liberty. These conditions do not amount to oppressive pretrial incarceration, and Bohn did not present evidence of any specific prejudice to his defense.

---

[5]Although pretrial prejudice may be presumed is some cases, such as when the delay is lengthy and attributable to bad faith by the government, *Brown*, 169 F.3d at 350 (citing *Doggett*, 505 U.S. at 657), this is not such a case.

Based upon the findings of the district court, and after our *de novo* consideration of the *Barker* factors, we agree with the district court's conclusion that the delay in this case did not result in a violation of Bohn's Sixth Amendment right to a speedy trial.

## IV.

Bohn's third argument on appeal is that the evidence was not sufficient to sustain the guilty verdicts on any of the charges. "In analyzing this claim 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Rayborn*, 495 F.3d 328, 337-38 (6th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard "we do not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the [factfinder]." *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999). "'[C]ircumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" *Rayborn*, 495 F.3d at 338 (quoting *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003)).

## A. Knowledge and Intent

Bohn contends that the evidence was insufficient to prove that he had knowledge that IDM's promotions were fraudulent or that he intended to join IDM in a mail fraud scheme.

"The elements of mail fraud are: (1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme." *United States v. Brown*, 147 F.3d 477, 483 (6th Cir. 1998). "A defendant does not commit mail fraud unless he possesses the specific intent to deceive or

defraud . . . ." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997). Because Bohn's

RICO and money laundering convictions were also premised on mail fraud, his knowledge

and intent to defraud are relevant to every count on which he was convicted. Bohn correctly

asserts that the government presented no direct evidence that he read IDM's promotional

materials or that he knew they were fraudulent. The specific intent to defraud, however, may

be established by circumstantial evidence. *Rayborn*, 495 F.3d at 338; *United States v. Isaiah*,

434 F.3d 513, 519-20 (6th Cir. 2006). A defendant's knowledge of a particular fact may also

be inferred from the defendant's deliberate ignorance or willful blindness to the existence of

that fact. *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000); *United States v.*

*Hoffman*, 918 F.2d 44, 46-47 (6th Cir. 1990).

IDM's promotional materials included representations that IDM would use a lottery

expert with a sixty percent success record to select lottery numbers on behalf of the

participants, that winnings were guaranteed up to $50,000, and that all winnings were tax-

free. Several witnesses, including Geoffrey Feldman, the outside consultant who was

responsible for the content of the promotional materials, testified that the promotional

materials contained false representations because that is what IDM wanted.

Bohn was President and CEO of European Bank Limited of Vanuatu ("EUB"). In

1995 IDM began using EUB to clear its customers' checks after IDM's accounts in other

banks had been closed due to high chargebacks and returned checks. Lottery players would

mail their payments by check to IDM in Barbados. IDM would send those checks by Federal Express either to EUB in Vanuatu, or directly to EUB's correspondent account at Marine Midland Bank in New York for deposit.

Bohn had more than a banking relationship with IDM. Bohn was also President and CEO of Atlas Corp. and PITCO. IDM used Atlas Corp. for making payments to lottery winners. IDM used PITCO for clerical work, including telex, fax, and telephone communications. An employee of IDM worked at PITCO to help sort and verify the IDM lottery checks. Fred Collier, the general manager of IDM, was listed as an authorized bank signatory for EUB, and was authorized not only to make deposits, but also to withdraw funds from EUB's Marine Midland Bank account.

Over time Marine Midland Bank developed concerns about the EUB account based on the high volume of small denomination checks, the subject matter of the checks (lottery), the routing of the checks directly from IDM, and the large number of complaints. When Marine Midland Bank contacted Bohn regarding the large number of complaints it was receiving from individuals who had written checks to IDM and did not receive anything in return, Bohn suggested that the bank refer the customer complaints regarding IDM to EUB for handling. In an effort to reassure Marine Midland Bank about the legitimacy of IDM, Bohn also faxed the bank a sample of one of IDM's promotional letters.

When Marine Midland Bank froze EUB's account in November 1995, Bohn, as an officer of EUB, assured Marine Midland Bank that he was very familiar with IDM's business

and could vouch for it. He requested Marine Midland Bank to keep the account open while

EUB made representations to another bank that it had conducted appropriate inquiries as to

IDM and believed that IDM conducted business in a legal, ethical, and competent manner.

In the meantime EUB arranged for IDM to send the checks to Vanuatu Maritime Services,

Ltd., a ship registry services organization owned by Bohn, which deposited IDM's checks

into Marine Midland Bank on behalf of IDM.

Based upon the blatantly false nature of the representations in IDM's promotional

materials, the degree to which Bohn and his businesses were involved in IDM's enterprise,

Bohn's access to at least some of IDM's promotional literature, and the efforts Bohn took

on behalf of IDM, including vouching for IDM and offering to field complaints from IDM's

customers, we are satisfied that the evidence, viewed in the light most favorable to the

government, was sufficient to permit a rational trier of fact to find beyond a reasonable doubt

that Bohn knew or willfully blinded himself to knowledge of IDM's fraudulent promotions

and that he intended to assist IDM in the mail fraud scheme.

**B. False Representations Reasonably Calculated to Deceive**

Bohn contends that even if the evidence was sufficient to show intent to defraud, the

evidence was not sufficient to show that any false representations were reasonably calculated

to deceive.

"[A] scheme to defraud, as prohibited by the mail fraud statute, 'must involve

misrepresentations or omissions reasonably calculated to deceive persons of ordinary

prudence and comprehension.'" *United States v. Jamieson*, 427 F.3d 394, 415 (6th Cir.

2005) (quoting *Berent v. Kemper Corp.*, 973 F.2d 1291, 1294 (6th Cir. 1992)).

Bohn contends that because the government failed to present testimony from any IDM

customer who sent IDM a check as a result of any specific false statement in the promotional

material, it is only speculation as to whether the person of ordinary prudence requirement has

been satisfied.

Neither reliance on the misrepresentations nor the actual success of the scheme is an

element of mail fraud. *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994). To be

actionable, the misrepresentations must merely be "worthy of reliance or credence."

*Jamieson*, 427 F.3d at 415. This is not an exacting standard. As we noted in *Jamieson*, the

purpose of the "prudence and comprehension" requirement is to ensure that the scheme was

"at least minimally credible." *Id.*

Here, the government offered ample evidence from individuals associated with IDM

that IDM sent out false promotional materials that were intentionally designed to target the

elderly and to induce them to send IDM money. The government also presented evidence

from five IDM customers. One customer testified that she sent IDM money in response to

IDM's representation that she had won a great sum of money and that she had to send a fee

to collect her winnings. Another testified that he sent IDM money because it looked good

based upon the promises and representations about people who had won. The very purpose

of IDM's false representations in its promotional materials was to induce customers to send

in their money. We are satisfied that the evidence was sufficient to show that the false representations in IDM's promotional materials were reasonably calculated to deceive, whether or not the recipients were in fact deceived.

**C.      Evidence re Mail Fraud for Counts Fifty-Five through Seventy-Two**

Bohn contends that the mail fraud charges in counts fifty-five through seventy-two should have been dismissed for failure of proof because there was no evidence that any of the checks in the Federal Express packages were fraudulently solicited. Bohn contends that because the government did not submit proofs regarding the individual checks in the Federal Express packages, there is no way to know whether the checks were sent by recipients of fraudulent promotional materials, or whether the checks were sent in reliance on the fraudulent promotional materials.

Because neither reliance nor success of the scheme is an element of a mail fraud charge, *Merklinger*, 16 F.3d at 678, the government was not required to prove that any specific check was sent in reliance on the misrepresentations. It was sufficient for the government to show that the checks were sent through the mail as part of the overall scheme of mail fraud. The government clearly met this burden.

**D.  Evidence re Money Laundering for Counts Seventy-Three through Eighty-Eight**

Bohn was charged in Counts seventy-three through eighty-eight with money laundering to promote mail fraud and to conceal the proceeds of that mail fraud in violation of 18 U.S.C. §§ 1956(A)(2)(a), (A)(2)(b)(1).

Bohn contends that the evidence was not sufficient to prove money laundering because the government failed to prove that he had "actual subjective knowledge" that the money used in the alleged money laundering transaction was derived from an unlawful source. *See United States v. Heaps*, 39 F.3d 479, 484 (4th Cir. 1996) (holding that the government must prove "actual subjective knowledge" and that a defendant "may not be convicted on just what he should have known").

Bohn's reliance on *Heaps* is misplaced. In this Circuit the knowledge requirements of § 1956 are construed to include instances of willful blindness. *United States v. Hill*, 167 F.3d 1055, 1067 (6th Cir. 1999). Because we have already determined that the circumstantial evidence was sufficient to show that Bohn knew about the mail fraud scheme, it follows that the evidence was also sufficient to show that Bohn knew that the money was from some form of unlawful activity. Thus, the evidence was sufficient to establish the knowledge requirements of the money laundering charges.

Bohn also contends that because the money laundering counts involve the same Federal Express shipments alleged in Counts fifty-five through seventy-two they should have been dismissed as duplicative. In support of this argument Bohn again relies on the Fourth Circuit's opinion in *Heaps*, which held that the defendant could not be convicted of money laundering based simply upon his receipt of money for the sale of drugs because he had already been convicted of the sale of drugs and there was no evidence that he used the money to further illegal operations. 39 F.3d at 484-86. According to the Fourth Circuit, the money

laundering statute should not be interpreted to criminalize the very same conduct already criminalized by the drug laws. *Id.* at 485-86.

We are not bound by *Heaps.* In this circuit we have held that the cashing of checks fraudulently obtained was sufficient evidence of an intent to promote the underlying fraudulent scheme. *United States v. Reed*, 167 F.3d 984, 992 (6th Cir. 1999) (citing *United States v. Haun*, 90 F.3d 1096, 1100 (6th Cir. 1996)). As we observed in *Reed*, there are two lines of cases regarding the evidence necessary to show intent to launder money, and this circuit has followed the line of cases holding that even where the underlying crime has been completed, "transferring or cashing a check promotes the prior unlawful activity and satisfies the requirement of the statute." 167 F.3d at 992 (citing *Haun*, 90 F.3d at 1100; *United States v. Cavalier*, 17 F.3d 90, 93 (5th Cir. 1994); *United States v. Paramo*, 998 F.2d 1212, 1217-18 (3d Cir. 1993)). *See also United States v. Valuck*, 286 F.3d 221, 226 (5th Cir. 2002) (reaffirming the holding in *Cavalier* that "the cashing of an illegally obtained check can promote the completion of an underlying unlawful act"). The Federal Express packages at issue in the money laundering counts contained checks fraudulently obtained by IDM. A rational trier of fact could reasonably conclude that the transfer of the checks from Barbados to New York and the negotiation of those checks promoted the underlying mail fraud scheme, and that by facilitating the negotiation of the checks Bohn specifically intended to promote the mail fraud scheme.

Finally, Bohn contends that his money laundering convictions are subject to dismissal because there was no evidence that he intended to aid IDM in concealing the source of the

funds.  The money laundering counts charge Bohn with violating two subsections of the money laundering statute, 18 U.S.C. § 1956(a)(2)(A) and § 1956(a)(2)(B)(i).  Subsection (a)(2)(A) requires proof of intent to promote the carrying on of unlawful activity, while subsection (a)(2)(B)(i) requires proof of knowledge that the transportation was designed to conceal the proceeds of the unlawful activity.  Although the government indicted on both subsections, it was only required to prove one or the other.  *See United States v. Hixon*, 987 F.2d 1261, 1265 (6th Cir. 1993) (holding that when an indictment charges several acts conjunctively under a statute which subjects several alternative acts to the same punishment, the government need only prove violation of one of the alleged acts to prove violation of the statute); *United States v. Westine*, No. 92-3664, 1994 WL 88831, at *2 (6th Cir. Mar. 17, 1994) (holding that promotion and concealment "are alternative bases for a money laundering conviction; proof of intent to accomplish either will suffice."); *United States v. Jackson*, 935 F.2d 832, 842 (7th Cir. 1991) (holding that where an indictment charges violations of both § 1956(a)(1)(A)(i) and § 1956(a)(1)(B)(i), the statute only requires proof on one or the other).  Because Bohn was indicted on both the promotion and the concealment bases of money laundering, his assertion that there were no proofs on concealment, even if accurate, would not entitle him to dismissal of the money laundering charges because there was clearly sufficient evidence of promotion.

We are satisfied that the evidence was sufficient to support Bohn's convictions on all charges.

**V.**

Bohn's final argument on appeal is that the criminal forfeiture should be vacated because the evidence was not sufficient to show a nexus between the specified property and any criminal activity.

On March 6, 2007, the district court entered a preliminary order of forfeiture ordering the forfeiture of $22,409,494.48 to be satisfied from any interest Bohn has in property identified in the forfeiture order. Paragraph 1(c) of the order identifies certain bank accounts as directly forfeitable property, and paragraph 2 identifies certain bank accounts as substitute assets. As evidenced in a stipulation between the government and Bohn, the amount of the forfeiture constitutes the amount in wire transfers that were made from EUB's IDM account at Marine Midland Bank to accounts in the name of IDM at four other banks.

Bohn does not contest the amount of the forfeiture. Instead, he contests the property identified to be forfeited. Bohn contends that the order of forfeiture is improper because there was no showing that the property identified in paragraphs 1(c) and 2 is his, or that there is a nexus between that property and racketeering or money laundering.

We review the district court's interpretation of the federal forfeiture laws *de novo*, the district court's findings of fact under a clearly erroneous standard, and the question of whether those facts are sufficient to constitute a proper criminal forfeiture *de novo*. *United States v. O'Dell*, 247 F.3d 655, 679 (6th Cir. 2001). "Forfeiture is an element of the

sentence imposed *following* conviction." *Libretti v. United States*, 516 U.S. 29, 38-39

(1995). Accordingly, the government's burden of proof in a criminal forfeiture proceeding

is proof by a preponderance of the evidence. *United States v. Hasson*, 333 F.3d 1264, 1277-

78 (11th Cir. 2003); *United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999).

The procedure for criminal forfeitures is governed by Rule 32.2 of the Federal Rules

of Criminal Procedure. Rule 32.2 requires the court to first determine "what property is

subject to forfeiture under the applicable statute" and then to determine "whether the

government has established the requisite **nexus** between the property and the offense." Fed.

R. Crim. P. 32.2(b)(1) (emphasis added).

The two statutes governing forfeiture in this case are the RICO statute, 18 U.S.C.

§ 1963, and the criminal forfeiture statute, 18 U.S.C. § 982. The RICO statute provides that

a person who is convicted of a RICO violation "shall forfeit" the following:

> (1) any interest the person has acquired or maintained in violation of section
> 1962;
> (2) any--
>     (A) interest in;
>     (B) security of;
>     (C) claim against; or
>     (D) property or contractual right of any kind affording a source
>     of influence over;
>     any enterprise which the person has established, operated,
>     controlled, conducted, or participated in the conduct of, in
>     violation of section 1962; and
> (3) any property constituting, or derived from, any proceeds which the person
> obtained, directly or indirectly, from racketeering activity or unlawful debt
> collection in violation of section 1962.

18 U.S.C. § 1963(a). The RICO forfeiture provisions are broadly construed to effectuate

their punitive rather than remedial purpose. *United States v. Corrado*, 227 F.3d 543, 552 (6th Cir. 2000) (citing *Russello v. United States*, 464 U.S. 16, 26-27 (1983); *United States v. DeFries*, 129 F.3d 1293, 1315 (D.C. Cir. 1997)); *see also United States v. Voigt*, 89 F.3d 1050, 1083-84 (3d Cir. 1996) (noting that § 1963(a)'s coverage is "extremely broad and sweeping"). Nevertheless, under the RICO statute the court is mandated to assess forfeiture against a defendant only when "the facts support a finding of a sufficient **nexus** between the property to be forfeited and the RICO violation." *Corrado*, 227 F.3d at 552 (emphasis added).

The criminal forfeiture statute which governs forfeiture after a conviction for money laundering in violation of 18 U.S.C. § 1956 provides that the court "shall order" the defendant to forfeit "any property, real or personal, **involved in** such offense, or any property **traceable** to such property." 18 U.S.C. § 982(a)(1) (emphasis added).

Although the preliminary order of forfeiture recites that the property identified in the order constitutes property that is forfeitable under either § 1962 or § 1956, Bohn contends that the government did not produce any evidence to establish the requisite nexus between the property and the offense.

In response, the government does not identify any evidence of a nexus between the property and Bohn's criminal activity. Instead, the government contends that because the entities named in the preliminary order of forfeiture (e.g., EUB, Atlas Corp., and PITCO) were all used to further IDM's criminal enterprise, under the broad language of the RICO

statute, Bohn's interest in each of those entities' assets is subject to forfeiture.

The government's response is wholly inadequate to support the forfeiture of specific property. The record does not include any evidence that any money of IDM, any money from an IDM customer, or any funds traceable to IDM has ever been deposited in any of the accounts. The record does not include any evidence that any of the accounts are in Bohn's name, that any of the accounts belong to Bohn, that any of Bohn's money has ever been deposited in the accounts, or that Bohn has ever had a beneficial interest in the funds in the accounts. The record does not include any evidence as to when the accounts were opened, who owns the accounts, or the source of the funds in the accounts. Whether any of the property listed in the preliminary order of forfeiture has any nexus to the RICO violation, or was involved in or traceable to the money laundering offense, is a matter of pure speculation.

There is not sufficient evidence in the record to show by a preponderance of the evidence that any of the property listed in the preliminary order of forfeiture is subject to forfeiture. Accordingly, the preliminary order of forfeiture will be reversed and the issue of forfeiture will be remanded to the district court for further proceedings.

## VI.

For the reasons stated, we affirm Bohn's conviction, but reverse and remand the order of preliminary forfeiture for further proceedings.